UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
                                          :
                                          :
In re DOCUMENT TECHNOLOGIES LITIGATION    :        17-cv-2405
                                          :        17-cv-3433
                                          :        17-cv-3917
                                          :
                                          :        OPINION
                                          :
------------------------------------------x

JED S. RAKOFF, U.S.D.J.

     The painstaking process of gathering and reviewing documents in

connection with litigation discovery used to be a task relegated to

(and dreaded by) young associates and paralegals at our nation's law

firms. With the advent of electronic discovery, however, firms have

shifted this task to third-party providers, who in turn have

developed clever strategies for cultivating customers, which they

guard jealously. Business apparently is booming – and so too are

providers' efforts to protect what they believe is their proprietary

information regarding customer contracts, strategies, and the like.

     Before the Court is the motion by Plaintiffs Document

Technologies, Inc. ("Document Technologies"), Epiq Systems, Inc.

("Epiq Systems"), and Epiq eDiscovery Solutions, Inc. ("Epiq

Solutions") (collectively, "DTI") for a preliminary injunction

against their former employees, Steve West, John Parker, Seth

Kreger, and Mark Hosford (collectively, the "Individual Defendants")

and a competitor of DTI, defendant LDiscovery, LLC ("LDiscovery").

In brief, plaintiffs allege that the Individual Defendants conspired

with LDiscovery to misappropriate their trade secrets and solicit their customers in violation of the Individual Defendants' employment agreements and state and federal law. The Court held a three-day evidentiary hearing on whether plaintiffs' were entitled to injunctive relief and, on the basis of the Court's assessment of the evidence presented at that hearing (including its assessment of the witnesses' demeanor and credibility), denied plaintiffs' motion by bottom-line Order dated June 16, 2017. This Opinion explains the reasons for that ruling.

The pertinent facts, as found by the Court for purposes of this motion, are as follows:

Plaintiff DTI employs nearly 7,000 employees and is a global provider of electronic discovery ("e-discovery") services for law firms and corporate legal departments. See transcript of evidentiary hearing ("Tr.") 497:3-17. DTI's formation is a relatively recent development, however, and is the result of an acquisition by Document Technologies of Epiq Systems and its wholly-owned subsidiary Epiq Solutions (collectively, "Epiq") in September 2016. Id. at 496:4-19.

The Individual Defendants were high level sales personnel at Epiq at the time of the acquisition and were responsible for bringing in new clients and maintaining existing client relationships. Id. at 497:18-499:10. As a condition of their employment, the Individual Defendants signed agreements with Epiq (the "Epiq Employment Agreements") containing numerous restrictive

2

covenants, including a one-year non-competition agreement, a one-year prohibition on soliciting the company's clients, a one-year prohibition on soliciting the company's employees, a broad non-disclosure provision, and a covenant to return the company's confidential information upon termination of employment. See PX 018; PX 037; PX 063; PX 064. The agreements further set forth that "all disputes relating to all aspects of the employer/employee relationship" shall be settled by arbitration, but establish a limited exception for the signatories "to obtain an injunction from a court of competent jurisdiction restraining [a] breach or threatened breach . . . of any [covenant] of this agreement." Id. Although these covenants remained in place following DTI's acquisition, the Individual Defendants have at all times been at-will employees. Id.; Tr. 153:2-154:4.

The Individual Defendants were dissatisfied with their employment even prior to DTI's acquisition. In their view, Epiq had made several operational and managerial errors that had cost these salesman both clients and personal revenue, in particular by underinvesting in document review centers in Washington, D.C. and Canada. Tr. 146:12-149:13. The Individual Defendants accordingly began looking for new employment in 2014, and jointly attended a meeting with one potential employer, Consilio, early that same year. Id. at 146:9-149:23, 151:1-155:25, 195:9-18, 196:18-197:22, 260:2-262:14, 262:18-264:3, 265:11-266:8, 290:17-293:1.

The Individual Defendants' concerns grew upon learning of DTI's proposed acquisition. They viewed DTI as a "low cost" provider that would harm their reputation and their relationship with their clients, and accordingly stepped up their efforts in mid-2015 to find new employment. Id. at 151:1–155:25. Then, in January 2016, defendant Kreger received a communication from a recruiter about an employment opportunity at defendant LDiscovery. Id. at 112:15-117:7. Defendant Kreger communicated this opportunity to the rest of the Individual Defendants and, in May 2016, the Individual Defendants met with representatives from LDiscovery in Washington, D.C. to discuss a potential transition. Id. In preparation for the meeting, the Individual Defendants informed LDiscovery of the amount of sales revenue they generated for Epiq from 2011 to 2016, id. at 393:20-394:4; PX 003, and notified LDiscovery at the meeting that they would require document review centers in Canada and Washington, D.C. if they were to join the company. Id. at 114:23-117:19. The Individual Defendants afterwards retained counsel to represent them in further negotiations, and thereby communicated extensively with LDiscovery about the terms of their potential transition during the remainder of the year. Id. at 200:23-202:17.

On January 4, 2017, the Individual Defendants signed employment agreements with LDiscovery whereby they agreed to resign from DTI by no later than January 31, 2017. See, e.g., PX 006; PX 042. The agreements set forth that the Individual Defendants will then take a "Sabbatical Year," during which LDiscovery will "not request and the

[Individual Defendants] will not provide, any work, information, or services purported to be restricted by the Epiq [Employment Agreements]." Id. Following the Sabbatical Year, the Individual Defendants will begin employment at LDiscovery in or around January 2018. Id. In return, LDiscovery agreed to pay each Individual Defendant signing bonuses between $1,200,000 and $1,400,000 (to be paid in quarterly installments during the Sabbatical Year) and base salaries between $781,096 and $911,278 (to be paid upon the start of their employment). Id. LDiscovery further agreed to indemnify the Individual Defendants for attorneys' fees and damages "relating directly to [their] contemplated transition and eventual transition from Epiq to employment with [LDiscovery]," except where a court has determined that the "[e]mployee engaged in the disputed conduct that forms the basis of that claim."[1] Id. The agreement lastly provides that the Individual Defendants may resign from LDiscovery for cause if it does not establish a document review operation in Canada and Washington, D.C. by April 4, 2019. Id.

On January 5, 2017, the Individual Defendants sent identical letters to DTI (drafted by counsel) resigning from the company, but offering to stay on for two weeks in order to assist with the

---

[1] The latter provision also requires that "there is substantial evidence that Epiq did not file the claim solely in retaliation for Employee's departure from Epiq" and "substantial evidence that Employee is culpable with respect to the allegations in that claim." Id. The requirements are redundant, however, because a court's finding of a defendant's liability necessarily meets these elements.

transition. Tr. 126:13-127:19; PX 181. The Individual Defendants did
not inform DTI that they had signed employment agreements with
LDiscovery, and DTI did not accept their offer to assist in the
transition. The next day, on January 6, 2017, a DTI representative
contacted the Individual Defendants and requested that they return
any property containing DTI's confidential information, pursuant to
their Epiq Employment Agreements.[2] See DTX 200-201.

The Individual Defendants partially complied. Although the
Individual Defendants returned their laptops and mobile devices,[3]
defendant West failed to return a thumb drive provided to him by
Epiq in August 2016 containing a backup of his company laptop. Tr.
at 52:19-53:12. Defendant Hosford similarly failed to return a thumb
drive inserted into his company computer approximately six weeks
before his resignation. Id. at 457:2-11; PX 249-003 at ¶ 7.

Several weeks later, around January 31, 2017, defendant Kreger
contacted a DTI employee for a list of invoices paid by his clients

---

[2] The return of company documents provision states in relevant part
that upon departure from the company, the Individual Defendants will
"promptly deliver to [Epiq] . . . any and all devices, records,
data, notes, . . . [or] other documents or property . . . developed
. . . pursuant to [their] employment with [Epiq] that constitute
Confidential Information, or otherwise belonging to Epiq." See,
e.g., PX 018.

[3] While DTI asserts in its complaint that defendant Kreger failed to
return his DTI-issued phone in order "to deprive DTI of the benefit
of trade secret, confidential, and proprietary information therein,"
see ECF No. 1, ¶¶ 130-131, defendant Kreger testified that he
inadvertently lost the device prior to his resignation, see Tr.
413:25-414:16, and DTI's post-hearing summation brief does not raise
the issue as a basis for injunctive relief.

6

in December 2016. See PX 240, 241; Tr. 397:23-399:19, 437:19-440:2.
This was common practice among DTI's sales personnel because the
company often made mistakes in calculating commissions checks, and
DTI regularly sent invoice lists to its employees so that they could
check the accuracy of their commissions payments. Tr. 438:9-439:7.
Rather than send Kreger only his own invoices, however, the DTI
employee forwarded a list of all of the company's invoices for the
entire month. See PX 240. Kreger then forwarded the invoice list to
the other Individual Defendants several hours later, purportedly so
that they could verify their commissions payments as well. Tr.
397:23-399:19, 437:19-440:2.

Three days later, on February 2, 2017, defendant West
circulated an email to the other Individual Defendants titled "Four
Horseman 2018 Game Plan." PX 088. According to the correspondence,
the Individual Defendants planned to meet in April 2017 to discuss
their sales strategy at LDiscovery. In order to prepare for the
meeting, defendant West circulated a spreadsheet so that each
Individual Defendant could input the names of his clients at Epiq,
the client contact information, and the revenue those clients
generated for 2016. Id.; Tr. at 380:24-384:16.

The Individual Defendants never met, however, and the
spreadsheet was never completed. This was because in March 2017, DTI
sent a cease-and-desist letter to the Individual Defendants
demanding, among other things, that they cease all communications
with DTI employees and customers "in any manner competitive with

DTI" and immediately return all materials relating to the company. See PTX 159. After discussing the matter, the Individual Defendants decided to postpone the meeting indefinitely. Tr. 251:6-24. One month later, in April 2017, DTI filed three lawsuits in federal court: the instant action in the Southern District of New York against defendants West, Kreger, and Parker (the "SDNY Action"), an action in the Northern District of Illinois against defendant Hosford (the "Illinois Action"), and an action in the Eastern District of Virginia against LDiscovery (the "Virginia Action"). See SDNY Compl. ¶¶ 84, 91, 132; Illinois Action Compl. ¶¶ 61, 78, 114; Virginia Action Compl., 17-cv-3733, No. 1, ¶¶ 46, 95, 98, 187.

The Court held an initial pretrial conference in the SDNY Action on April 12, 2017, during which counsel for all the defendants agreed to a common discovery plan applicable to all the actions. Two days later, on April 14, 2017, the Individual Defendants in the SDNY Action moved to transfer the case to the Eastern District of Virginia, and on April 25, 2017, the Court issued an Opinion and Order denying the motion. On May 1 and May 10, 2017, the courts presiding over the Virginia and Illinois Actions issued orders transferring their cases to this District, and the Court consolidated the actions by Order dated May 19, 2017. As noted, the Court subsequently held a three-day evidentiary hearing on DTI's motion for a preliminary injunction from May 30 to June 1,

2017, after which counsel submitted written opening and rebuttal summations.[4]

A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a <u>clear showing</u>, carries the burden of persuasion." <u>JBR, Inc. v. Keurig Green Mountain, Inc.</u>, 618 F. App'x 31, 33 (2d Cir. 2015) (quoting <u>Sussman v. Crawford</u>, 488 F.3d 136, 139 (2d Cir. 2007))(emphasis in original). With exceptions not here relevant, the moving party must show four elements: "(1) likelihood of success on the merits; (2) likelihood that the moving party will suffer irreparable harm if a preliminary injunction is not granted; (3) that the balance of hardships tips in the moving party's favor; and (4) that the public interest is not disserved by relief." <u>Id.</u> (quoting <u>Salinger v. Colting</u>, 607 F.3d 68, 79-80 (2d Cir.2010)).

The Court begins with DTI's claims for injunctive relief against LDiscovery and, in particular, the claim that LDiscovery tortiously interfered with DTI's relationships with existing and prospective customers. Under New York law, tortious interference with existing customer relations consists of five elements: "(1) the

---

[4] After the Court consolidated the actions but before the evidentiary hearing, the Individual Defendants filed a motion to compel arbitration of all counts not seeking injunctive relief for the breach or threatened breach of the Epiq Employment Agreements. The Court issued a bench order during the hearing granting the Individual Defendants' motion and, accordingly, this Opinion is limited to DTI's claims against the Individual Defendants for injunctive relief for breach of contract and DTI's claims for injunctive relief against LDiscovery.

9

existence of a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the thirdparty's breach of contract without justification; (4) actual breach of the contract; and (5) damages to plaintiff." American Bldg. Maintenance Co. of New York v. Acme Property Servs., Inc., 515 F. Supp. 2d 298, 308 (N.D.N.Y. 2007). Likewise, tortious interference with prospective customer relations requires that the plaintiff show: "(1) [that] it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Id. at 316.

DTI contends here that LDiscovery intentionally induced the Individual Defendants to breach the restrictive covenants in their employment agreements by indemnifying them against claims that would foreseeably be brought by DTI and by agreeing to pay them a collective $5.1 million during their Sabbatical Year. The Court, however, is unpersuaded that LDiscovery has done anything improper by entering into these agreements with the Individual Defendants, let alone that the Individual Defendants have breached the applicable terms of their agreements with DTI.

As previously noted, the Individual Defendants forfeit their right to indemnification should a court find that they have "engaged in the disputed conduct that forms the basis of [DTI's] claim,"

10

e.g., PX 006; PX 042, so the Individual Defendants' agreements with LDiscovery can hardly be read as an inducement to commit such breaches. Moreover, it makes perfect sense for LDiscovery to compensate the Individual Defendants during the Sabbatical Period for their year of lost income as a way of inducing them to join the company. Tr. 395:8-19. Indeed, LDiscovery set forth a rational business case for these payments during the evidentiary hearing, see Tr. 356:3-12, and there is thus no basis for the Court to infer that the signing bonuses are in return for any alleged wrongdoing. The Court accordingly finds that DTI has failed to show a likelihood of success on the merits for its claims for tortious interference against LDiscovery.

DTI similarly fails to show a likelihood of success on the merits for its misappropriation claims. The requirements for showing a misappropriation of a trade secret are similar under state and federal law. Under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means. N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 43-44 (2d Cir. 1999). Likewise, under the federal Defend Trade Secrets Act ("DTSA"), a party must show "an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances

11

giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., No. 15CV211LGSRLE, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) (quoting 18 U.S.C. § 1839(3) (A)-(B)). Although there is no one-size-fits all definition to a trade secret, New York courts generally consider the following factors to determine its contours:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Bancorp Servs., LLC v. Am. Gen. Life Ins. Co., No. 14-CV-9687 (VEC), 2016 WL 4916969, at *11 (S.D.N.Y. Feb. 11, 2016).

Plaintiffs ignore these elements altogether. Instead, DTI contends that the Individual Defendants have disclosed "confidential information" to LDiscovery concerning DTI's "business development efforts and strategies" by requesting, as part of their employment negotiations, that LDiscovery open document review centers in Washington, D.C. and Canada. See Plaintiffs' Post-Hearing Brief in Support of Their Motion for Preliminary Injunction ("Pls.' Summation") at 3, ECF No. 60. Putting aside for a moment that Epiq's website publicly states that it operates in these regions,[5] or that

---

[5] See, e.g., http://www.epiqsystems.com/the-epiq-difference/offices; http://www.epiqsystems.com/ediscovery-canada.

DTI discloses this information in unredacted form in its amended complaint, see ECF No. 56 at ¶¶ 60-64, or that DTI has not requested that the defendants redact this information from their own post-hearing summations, see ECF No. 64 at 2-3, there is nothing "confidential" about the fact that Canada and Washington, D.C. have law firms and corporate legal departments requiring document review services, so that they are obvious markets. DTI does not have a monopoly on entire geographic regions, and cannot prevent competition in such areas by twisting the contours of trade secrets law.

For the foregoing reasons, the Court concluded that plaintiffs had failed to show a likelihood of success on the merits on any of their claims against LDiscovery, and accordingly denied their motion for a preliminary injunction against LDiscovery in its Order dated June 16, 2017.

The Court next turns to DTI's claims against the Individual Defendants. DTI's principal contention is that the Individual Defendants have breached or are threatening to breach their non-disclosure covenants by improperly copying and retaining DTI's proprietary information. The Epiq Employment Agreements prohibit the Individual Defendants from disclosing Epiq's "Confidential Information," which includes "any information of Epiq, its vendors or its customers including but not limited to proprietary information, technical data, trade secrets, . . . customers lists,

customers, [and] markets,"[6] see, e.g., PX 018, and also require the Individual Defendants to return DTI's Confidential Information upon the termination of their employment. See id. While there is no dispute that the Individual Defendants initially retained some of DTI's proprietary information following their resignations, the testimony and forensic evidence from the evidentiary hearing established to the Court's satisfaction that this was inadvertent rather than the result of a conspiracy.

First, contrary to the allegations in DTI's preliminary injunction motion, defendant West did not "mass copy" documents from his company laptop to a thumb drive prior to his resignation. See ECF No. 7 at 10. Rather, in September 2016, DTI sent West a thumb drive containing information recovered from his broken company computer. Tr. 165:9–172:16; DX 166, 167, 173, 174. West then transferred the information to his new company laptop, placed the thumb drive into a desk drawer in his home office, and forgot it was there until he read the allegations in DTI's complaint. Tr. 171:8–174:2; DX 176. West subsequently contacted counsel and placed the thumb drive in an envelope, where it sat until the parties' agreed-upon third-party forensic consultant retrieved it. Tr. 108:23–109:23, 174:6–175:21, 181:3–9; DX 236. The ensuing forensic analysis confirms West's account and shows that West did not access the thumb

---

[6] The definition of Confidential Information excludes "information . . . that [is] publicly known and generally available through no wrongful act." See PX 018; PX 037; PX 063; PX064.

14

drive between October 3, 2016 (when he initially copied the files onto his new laptop) and April 5, 2017 (the morning after he was served with the complaint in this action). See DX 215 at 6-7; DX 216 at 3-6; PX 244 at 2; Tr. 470:1-473:20; Tr. 483:13-485:20.

Second, defendant Hosford testified that although he does not have a specific recollection of his missing thumb drive, he likely transferred DTI's materials onto the device in preparation for a client meeting and left the drive with the client, which was consistent with his past practice. See Tr. 255:5-9. The forensic analysis presented at the evidentiary hearing confirms that the thumb drive was never subsequently inserted into any of the defendants' computers, see DX 143-48, DX 196-197; Tr. 470:4-21, and there is no evidence that Hosford was aware that the defendants' devices would log the drive's serial number upon use and therefore kept it hidden.

Third, defendant Kreger did not improperly obtain DTI's invoice list for December 2016. There is no dispute that DTI voluntarily forwarded the spreadsheet to Kreger nearly a month after his resignation, knowing that he was no longer an employee. There is also no dispute that DTI regularly sends such lists to its sales personnel so that they can verify the accuracy of their commissions checks, and that this was Kreger's stated purpose in requesting the information. Moreover, the transmittal email from DTI contained no instructions requiring Kreger to delete the spreadsheet upon the

completion of his review, and DTI fails to identify any provision of Kreger's employment agreement that mandates that he do so.

Kreger's decision to forward the invoice list to the other Individual Defendants is also not improper based on the testimony presented at the evidentiary hearing. Kreger testified that he believed the other Individual Defendants would also want to verify their commissions, Tr. 439:2-23, and defendant Parker corroborated that he too "had an ongoing discussion going on with finance questioning [his] January commission" and reviewed the spreadsheet sent by Kreger for that purpose, Tr. 398:3-399:21. The Individual Defendants further testified that they did not disseminate the spreadsheet to any third parties, including LDiscovery. Tr. 156:21-157:6, 268:6-18, 355:10-23, 382:14-18, 398:4-399:21, 401:6-10, 436:25-437:12, 439:20-23. While DTI dismisses these explanations as self-serving, there is no evidence to the contrary, and the Court sees no reason to draw an adverse inference against the Individual Defendants when it was DTI that decided to disseminate its entire invoice list to defendant Kreger in the first place.

For the foregoing reasons, the Court concluded that DTI had failed to show a likelihood of success on the merits for its misappropriation claims because it had not shown that the Individual Defendants intentionally retained DTI's confidential information to gain an improper advantage in their new employment, and the Court

accordingly denied that prong of plaintiffs' motion in its Order of June 16, 2017.[7]

The Court next turns to DTI's contention that the Individual Defendants have violated the terms of their non-competition covenants. The provisions set forth in relevant part that the Individual Defendants for 12 months after termination will not "compete against [Epiq] . . . , or engage in employment with or provide independent contractor or consulting services for any . . . entity which . . . compete[s] against [Epiq]." See PX 018; PX 037; PX 063; PX064; Tr. 42:5-45:10. DTI argues that by executing employment agreements with LDiscovery and engaging in several preparatory activities for their employment in 2018, the Individual Defendants have breached their non-competition covenants warranting the issuance of a preliminary injunction. See, e.g., PX 042; Tr. 237:21-238:14.

DTI is incorrect as a matter of law. Under applicable New York law, a former employee may prepare to compete during the term of a non-competition provision, because restraining such acts "would have the effect of extending the term of the covenant." Stork H & E Turbo Blading, Inc. v. Berry, 932 N.Y.S.2d 763 (Sup. Ct. 2011) (citing

---

[7] For similar reasons, DTI also failed to show the element of irreparable harm. Defendant West is no longer in possession of the disputed thumb drive, and defendants Kreger and Parker have stated that they are willing to delete the DTI's invoice spreadsheet upon request. Tr. 439:17-23. As set forth previously, the Court also finds Hosford's testimony credible that he is no longer in possession of his disputed thumb drive.

Walter Karl, Inc. v Wood, 137 AD2d 22, 28 (1988)). New York courts have accordingly held as legitimate acts ranging from incorporating a later competing business, see Walter, 137 AD2d at 28, to building facilities, Stork, 932 N.Y.S.2d at 763, and filing and obtaining trademarks.[8] Abraham Zion Corp. v. Lebow, 593 F. Supp. 551, 571 (S.D.N.Y. 1984), aff'd, 761 F.2d 93 (2d Cir. 1985).

To be sure, acts cease to be preparatory where they detrimentally impact the former employer's economic interests during the term of a non-competition clause. See, e.g., Am. Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 906 (2d Cir. 1998) (citing AGA Aktiebolag v. ABA Optical Corp., 441 F. Supp. 747, 754 (E.D.N.Y. 1977) (defendant breached his duty of loyalty by soliciting customers for himself while still employed for the plaintiff)). But the Individual Defendants have not crossed that line here. Specifically, while it is undisputed that defendant West prepared and circulated a rudimentary spreadsheet containing the names, locations, contacts, and revenue estimates for some of his DTI clients and that the Individual Defendants intended to input additional client information into the spreadsheet, (but decided not to do so after DTI filed the instant lawsuit), preparing such a spreadsheet is no different than building a facility for a later

---

[8] Although several of these decisions involved defendants who prepared to compete while still employed by the former employer, there is no reason why this reasoning is not equally applicable to defendants who are former employees but subject to non-competition covenants. See, e.g., Stork, 932 N.Y.S.2d at 763.

competing business, for the spreadsheet has no effect on DTI's economic interests until it is actually used. Here, there is no evidence that the Individual Defendants inappropriately solicited any of DTI's clients during the non-competition period, nor is there evidence that the Individual Defendants turned over this spreadsheet (or any other document containing DTI's client information) to LDiscovery.[9]

Moreover, the Individual Defendants did not use (or intend to use) DTI's trade secrets to populate the spreadsheet.[10] See Stork, 932 N.Y.S.2d at 763 ("An active employee may prepare to compete—even in secret—prior to his departure, provided that he does not use his employer's time, facilities or proprietary secrets to do so."). DTI's clients consist of major law firms and corporate legal

---

[9] While DTI also argued that defendant Kreger logged onto DTI's customer relationship management program (which contained information about business opportunities and customer preferences) 25 times the day before signing his employment agreement with LDiscovery, Kreger testified that he had no recollection of having done so, Tr. at 392:18-25, and DTI introduced no evidence showing that he actually accessed the system.

[10] DTI identifies three other spreadsheets, also prepared by the Individual Defendants; but none of these includes DTI's confidential information. The first consists of client business cards collected by Kreger during his employment at DTI, which DTI returned to him when they mailed him his personal effects after his resignation. Tr. 73:14-74:24. The second consists of names and email addresses of AIG employees that West created from memory and primarily using LinkedIn. Id. at 75:19-77:23, 78:19-79:10, 175:22-178:4; DX 151. The third is comprised of contact information sent to West by his father, a senior partner at Weil, Gotshal & Manges LLP, who routinely sent his son information concerning potential clients. Id. at 80:9-83:18.

departments whose names are widely known, and their locations and contact information are readily ascertainable from corporate websites, LinkedIn, and Google. Tr. 66:18-67:3; DX 243 at 151:2-13, 151:15-23, 166:23-168:12. The Individual Defendants' general knowledge of the revenue attributable to each client is further not protectable, since labeling this kind of knowledge as proprietary would "prevent former employees from ever pursuing clients or customers whom they believe generate substantial business for their former employers."[11] RogersCasey, Inc. v. Nankof, No. 02 CIV. 2599 (JSR), 2003 WL 1964049, at *5 (S.D.N.Y. Apr. 24, 2003). In short, there was nothing improper about the Individual Defendants' preparing spreadsheets of non-protectable client information and discussing their future employment at LDiscovery.

For the foregoing reasons, the Court concluded that DTI had failed to show a likelihood of success on the merits that the Individual Defendants had violated the terms of their non-competition agreements, and accordingly denied this prong of plaintiffs' motion as part of the Order of June 16, 2017.

---

[11] The Individual Defendants' general revenue numbers for 2011 to 2016, which they transmitted to LDiscovery as part of their employment negotiations, are not trade secrets for similar reasons. DTI does not dispute that it is industry practice for e-discovery providers to ask potential sales hires for their past revenue figures and that it would be extraordinarily difficult (if not impossible) for the Individual Defendants to get a sales job with another employer if they were not able to disclose such information. See Tr. 270:17-271:13; PX 310 at 104:7-11, 104:13-19, 105:7-13.

The Court next turns to DTI's contention that the Individual Defendants breached their employee non-solicitation clauses, which state that during their employment and for a 12-month period after termination, the Individual Defendants may not "attempt to hire, solicit, induce, recruit or encourage any other employees or agents of Epiq to terminate their employment . . . with Epiq in order to work for any . . . entity other than Epiq." See PX 018; PX 037; PX 063; PX 064. DTI now asserts that the Individual Defendants breached this provision by jointly searching for new employment, because, by doing so, they became "much more attractive than a lone wolf pitch to employers looking to poach their competitors' rainmakers." Plaintiffs' Rebuttal to Defendants' Written Summations ("Pls.' Rebuttal") at 5, ECF No. 65.

This restrictive covenant is, however, unenforceable insofar as it purports to prohibit at-will employees, who have yet to accept an offer of new employment, from "inducing" or even "encouraging" their coworkers to leave their present employer. In that connection, New York courts apply a three-part reasonableness test to covenants prohibiting the recruitment of employees. Kelly v. Evolution Markets, Inc., 626 F. Supp. 2d 364, 374 (S.D.N.Y. 2009). Such a covenant "is reasonable only if it; (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." Id. (quoting BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 388-389 (N.Y.1999) (citing Restatement

21

(Second) of Contracts § 188 (1981)). The employee non-solicitation provision here fails all three requirements.

First, although DTI contends that the covenant prevents "the potential harm to a company's operations arising from the coordinated en masse resignation of several employees," Pls.' Rebuttal at 7, this is not a legally cognizable interest for the purposes of a restrictive covenant.[12] The "legitimate interest of the employer must protect against unfair competition, not simply to avoid competition in a general sense." Kelly, 626 F. Supp. 2d at 374 (citing Lazer, 823 N.Y.S.2d at 834). Accordingly, the New York Court of Appeals has "limited the cognizable employer interests under the first prong of the common-law rule to the protection against misappropriation of the employer's trade secrets or of confidential customer lists, or protection from competition by a former employee whose services are unique or extraordinary." BDO Seidman, 93 N.Y.2d

---

[12] Unlike the situation here, however, en masse resignations may support a claim for breach of fiduciary duty where those resignations are part of a coordinated effort to "benefit [the defendants] through destruction of plaintiff's business." Duane Jones Co. v. Burke, 306 N.Y. 172, 189 (1954). Such coordination nonetheless requires more than shared timing of a few resignations. See Town & Country House & Home Serv., Inc. v. Newbery, 3 N.Y.2d 554, 557-58 (1958). For example, in Duane Jones, five former officers and directors and two other key employees of the plaintiff's advertising agency, constituting 90% of its skilled employees as well as a majority of the entire working force, agreed to form a competing business, solicited the plaintiff's customers prior to their departures, and then resigned en masse, thereby acquiring overnight upwards of 50% of the business of their previous employer. 306 N.Y. at 172, 198; Town & Country House, 3 N.Y.2d at 557-58.

at 389 (citing <u>Reed, Roberts Assocs., Inc. v. Strauman</u>, 40 N.Y.2d 303, 308 (1976)).

DTI does not contend that the employee non-solicitation covenant is necessary to protect its trade secrets or confidential customer lists.[13] And even if the Individual Defendants' services could be described unique or extraordinary,[14] their decision to market themselves as a "package deal" is not a form of competition, let alone <u>unfair</u> competition. As the non-competition covenants in the Epiq Employment Agreements themselves recognize, competition requires <u>engaging</u> in services for a competitor, and there is no evidence that the Individual Defendants intended their resignations to disrupt DTI's operations for LDiscovery's benefit or that this

---

[13] Indeed, it is hard to imagine how this would be true given that the Individual Defendants are subject to non-disclosure provisions. See, e.g., <u>Glob. Telesystems, Inc. v. KPNQwest, N.V.</u>, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001) (plaintiff had a legitimate interest in enforcing an employee non-solicitation covenant where the employee at issue, the plaintiff's chief financial officer, was not subject to a non-disclosure provision).

[14] Although the Court does not reach the issue, there is no evidence that this is the case. The mere fact that the Individual Defendants were some of DTI's top-earners is immaterial. <u>DataType Int'l, Inc. v. Puzia</u>, 797 F. Supp. 274, 283 (S.D.N.Y. 1992) ("Puzia is a salesman. To be sure, he is a very good salesman; but there is nothing unique about the nature of his services."). There is no testimony that DTI was substantially responsible for the Individual Defendants' success, such as by providing specialized training or "market intelligence" concerning prospective clients. <u>Natsource LLC v. Paribello</u>, 151 F. Supp. 2d 465, 473 (S.D.N.Y. 2001); <u>Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l, Ltd.</u>, 797 N.Y.S.2d 883, 888 (Sup. Ct. 2005). To contrary, the Individual Defendants testified that their primary reason for leaving DTI was that it <u>underinvested</u> in client relationships and review facilities.

actually occurred. Indeed, the Individual Defendants lacked an incentive to do so given that they cannot solicit any customers for LDiscovery until January 2018, and therefore could not take immediate advantage of any "disruption" that may or may not have occurred.

To be sure, if DTI desires to prevent its employees from coordinating their resignations, it is free to hire them pursuant to term employment agreements. DTI, however, cannot use restrictive covenants to supply itself all the benefits of term agreements while simultaneously retaining the right to lay off its personnel whenever it so desires. This is not a proper purpose for such a restraint on free market competition.

Second, the restrictive covenant imposes an undue hardship on DTI's employees because it goes far beyond DTI's stated goal of preventing "en masse" resignations.[15] As DTI readily acknowledges, the non-solicitation provision prohibits any speech that "encourages" or "induces" an employee to terminate his or her employment, from direct solicitations to such banal statements as an

---

[15] The decision in Estee Lauder Companies Inc. v. Batra, 430 F. Supp. 2d 158, 182 (S.D.N.Y. 2006), which is not binding on this Court, is not to the contrary. There, Judge Sweet held that the defendant breached his employee non-solicitation clause by emailing a fellow employee, while still employed by the plaintiff, that "I would drag you with me kicking and screaming even if you didn't want to come." Id. at 165. The defendant in Estee Lauder, however, did not dispute the validity of his non-solicitation clause, and therefore the court did not reach whether the provision was enforceable under New York law.

employer is a "mess" and that an employee "would be able to find other gainful employment without an issue."[16] See Pls.' Summation at 26. Given the vagueness of its terms, the covenant is thus nothing short of a contractual gag rule on employee complaints, which neither New York law nor common sense could possibly enforce, let alone have a lawful basis for doing so. See, e.g., Gold v. Maurer, No. CV 17-734 (CKK), 2017 WL 1628873, at *5 (D.D.C. May 1, 2017) (denying preliminary injunction prohibiting the defendant "on any occasion in which he chose to discuss the circumstances of his departure from [his former employer]" because such an order would amount to an overly broad restraint on speech).

Third, the covenant's restrictions are injurious to the public. There is no dispute here that each of the Individual Defendants had already resolved to leave DTI-Epiq before they began coordinating their job search. See Pls.' Summation at 27. DTI contends, however, that the restrictive covenant still applies with full force because merely discussing other potential employers constitutes "encouragement" to leave the company. Id.

_____

[16] Although these statements were made by the Individual Defendants to a DTI employee after they had resigned to the company, the point is that they are examples of the types of conversations that the employee non-solicitation provisions makes improper, regardless of time or circumstance, and that the Individual Defendants no doubt shared in coming to their conclusion to seek alternative employment. See Tr. 148:10-149:23 (testimony by defendant West describing his grievances with Epiq and the fact that he shared his concerns with the other Individual Defendants prior to their deciding to seek new employment).

This is a bridge too far. In addressing whether a restrictive covenant is injurious to the public, the Court must "take account of any diminution in competition likely to result from slowing down the dissemination of ideas and of any impairment of the function of the market in shifting manpower to areas of greatest productivity." Restatement (Second) of Contracts § 188 (1981). The employee non-solicitation covenant here, in turn, serves to keep departing employees in the dark about job opportunities beyond DTI. It is under these circumstances that the public interest most strongly supports the free flow of information concerning alternative employment, however, since this effectuates the efficient redistribution of labor and the "harm" to DTI of losing the employee is a forgone conclusion.

The foregoing analysis applies also to DTI's claims that the Individual Defendants improperly solicited two other DTI employees, Gary Suffir and Myriam Schmell. Since DTI does not contend that either employee possesses any trade secrets or provides "unique" or "extraordinary" services, the non-solicitation clause fails under the first element of the reasonableness test. The evidentiary hearing further unequivocally established that Ms. Schmell was already intending to leave DTI at the time that the Individual Defendants spoke to her about alternative employment (because DTI had informed her that she would be laid off), Tr. 45:17-25, and the non-solicitation clause is therefore additionally unenforceable as to her under the third element of the reasonableness test.

Lastly, even if DTI could show that the employee non-solicitation provisions are enforceable, it would still not be entitled to a preliminary injunction because it has failed to establish irreparable harm. See N.Y. ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 660 (2d Cir. 2015) (quoting Forest City Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 153 (2d Cir. 1999)(irreparable harm requires an "injury that is neither remote nor speculative, but actual and imminent")). DTI does not contend that it has suffered any harm as a result of the Individual Defendants' communications with Mr. Suffir and Ms. Schmell, and has offered only conclusory statements from its Chief Integration Officer that the company saw "harm to [its] good will" because of the Individual Defendants' "abrupt" departure. Tr. 532:15-22; 537:5-12. It is precisely this type of unsubstantiated testimony, disconnected from proof that any customers have actually ceased doing business with DTI or testimony from any clients that they think less of the company, that New York courts have held is insufficient to show actual or imminent harm to a plaintiff's "goodwill." John G. Ullman & Assocs., Inc. v. BCK Partners, Inc., 139 A.D.3d 1358, 1359 (N.Y. App. Div.).

For the foregoing reasons, the Court concluded that DTI had failed to show a likelihood of success on the merits or irreparable harm for the Individual Defendants' purported breach of the Epiq Employment Agreements' employee non-solicitation clauses, and

consequently denied these prongs of plaintiffs' motion in its June 16, 2017 Order.

The Court turns finally to DTI's claim that the Individual Defendants have breached their client non-solicitation covenants. The Epiq Employment Agreements do not require the Individual Defendants to cease all contact with their clients following their departure from DTI. Rather, they prohibit the Individual Defendants from engaging in activity that would influence Epiq's customers to transfer their business to a competitor.[17] The Individual Defendants have abided by this covenant. For example, defendant Hosford testified that whenever he spoke to a former client, he never informed them of the name of his future employer and spoke only in vague terms that he "may be in touch in the future." Tr. at 240:10-241:5. Indeed, after receiving a voicemail from one former client, Hosford responded by email – copying several DTI employees on the communication – stating that "because of my employment agreement, it's best for both of us I do not respond with further detail" and to "call me if you have additional questions." See DTX 125.

---

[17] The non-solicitation clause states in relevant part that the Individual Defendants for a period of 12 months following termination will not: "(a) solicit, serve or cater to any of Epiq's customers whom [they] solicited, served or catered to on behalf of Epiq . . . ; (b) divert or attempt to divert any of Epiq's customers . . . ; or (c) call upon, influence, or attempt to influence any of Epiq's customers to transfer their business or patronage from Epiq to [them] or to any other . . . business entity engaged in a business similar to Epiq's business." See PX 018; PX 037; PX 063; PX 064.

The remainder of the alleged solicitations, such as a suggestion by defendant Kreger to grab lunch or for a particular client to call him, are innocuous. See PX 118; PX 243. The Individual Defendants testified that several of their former clients were also personal friends, see Tr. 63:4-9; 245:5-6, and DTI has not introduced any testimony from its clients stating that the Individual Defendants have solicited them for business.[18] See FTI Consulting, Inc. v. Graves, No. 05 CIV 6719 NRB, 2007 WL 2192200, at *10 (S.D.N.Y. July 31, 2007) (defendant's informing clients that he intended to leave his employer did not constitute improper solicitation). DTI has thus failed to show a likelihood of success on the merits that the Individual Defendants have breached their client non-solicitation clauses.

In sum, DTI's motion for a preliminary injunction fails as to the facts and the law. On the facts, DTI mistakenly portrays what are in actuality innocuous or otherwise legitimate acts by LDiscovery and the Individual Defendants as part of a conjectural (but unsupported) scheme to misappropriate DTI's trade secrets and improperly compete for its clients and employees. On the law, DTI's expansive view of its trade secrets and the restrictive covenants in its employment agreements is at odds with New York law and the testimony elicited during Court's three-day evidentiary hearing, and

---

[18] Indeed, DTI strategically chose to forgo examining Kreger at the evidentiary hearing about his suggestion to grab lunch and instead introduced the email into evidence through defendant Parker, who had no personal knowledge of what later transpired. Tr. 391:2-20.

DTI accordingly has failed to show a likelihood of success on the merits or imminent and irreparable harm.

For all the foregoing reasons, the Court denied DTI's motion for a preliminary injunction in its Order dated June 16, 2017.

Dated:    New York, NY
          July 5, 2017                          JED S. RAKOFF, U.S.D.J.